**Opinion issued December 31, 2024**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-23-00018-CV

———————————

**JENNIFER MORTELL, RICHARD "DICK" MORAW,
AND JAMES "SONNY" PERRY,**
Appellants/Cross-Appellees

**V.**

**N. RUSSELL SCOTT AND KATHRYN MULLEN,**
Appellees/Cross-Appellants

*and*

**RUSTY SCOTT AND MELANIE MCDONALD,**
Appellants

**V.**

**N. RUSSELL SCOTT AND KATHRYN MULLEN,**
Appellees

On Appeal from the 149th District Court
Brazoria County, Texas
Trial Court Case No. 102448-CV

**MEMORANDUM OPINION**

Appellants/cross-appellees, Jennifer Mortell, Richard "Dick" Moraw, and James "Sonny" Perry, and appellants, Rusty Scott ("Rusty") and Melanie McDonald (collectively "appellants"), challenge the trial court's order granting the motion for sanctions filed against them by appellees/cross-appellants, N. Russell Scott ("Scott") and Kathryn Mullen, in the suit against Scott and Mullen for forgery, fraud, breach of fiduciary duty, money had and received, constructive trust, and a declaratory judgment. In four issues, appellants contend that the trial court erred in granting the motion for sanctions filed by Scott and Mullen (the "sanctions motion") and awarding Scott and Mullen attorney's fees.

In their sole issue on cross-appeal, Scott and Mullen contend that the trial court erred in awarding them only a small portion of their requested attorney's fees.

We affirm.

**Background**

In her second amended petition, Mortell alleged that her father, Scott, was the primary beneficiary and Mortell and her siblings, Rusty, McDonald, and Christopher Scott ("Christopher"), were remainder beneficiaries of the Scott Family Trust (Irrevocable) (the "trust"). When the trust was created in September 1997, the trust property consisted of a 1,541.99 acre tract of land in Brazoria County, Texas that

Scott had purchased earlier that year. Later, other parcels of real property located in Colorado and New Mexico were added to the trust. Mortell named the former trustees, Moraw and Perry, as necessary parties to her suit.

Mortell further alleged that as the trust's primary beneficiary, Scott took proper "distributions for his health, maintenance, and support" as permitted under the trust. In about 2007, Scott "met and began dating [Mullen], a licensed attorney in the state of Texas." Mullen "h[eld] herself out in various roles," including as "Scott's girlfriend, "his attorney," and even "[his] wife."

Mortell alleged that after Mullen began living with Scott, the relationships between Scott and his children became "increasingly more contentious." According to Mortell, Mullen restricted the children's access to Scott. She took "complete control over [Scott's] cell[ular] [tele]phone" and would "not permit Scott's children to visit" him "unless she approve[d]" the visit in advance. Mortell also believed that Scott "suffer[ed] from reduced mental capacity as a result of age-related memory loss." Mortell surmised that "Mullen ha[d] taken increasing advantage of Scott's diminished mental capacity to gain control of Scott and his assets."

Mortell further alleged that in 2008, Mullen "began a campaign" "to terminate the [t]rust and have the property distributed to [Scott] outright." She "began taking control of the trust property by asserting that she represented the [t]rust as its

3

attorney," and she "chang[ed] the mailing addresses" for the trust property from the trust's business address, where the trustees would receive it, "to her own address."

According to Mortell, Mullen, in an attempt to terminate the trust, drafted a Termination Agreement and Mutual Release (the "trust termination agreement"). Scott signed it, but he either "did not have capacity to execute [it] . . . or [Mullen] unduly influenced him to sign the [the trust termination agreement] and lie to his children." Mullen then "pressured Scott's children to sign [the trust termination agreement]." Mortell "did not sign" the trust termination agreement when Mullen first presented it because she "fe[lt] strongly that [Mullen]'s actions were suspicious." Ultimately, though, Mortell signed it and "back dated her signature at [Mullen]'s prompting." But neither Mortell's brother, Christopher, nor the trust's co-trustee, Moraw, "ever signed any agreement to terminate the [t]rust," and both denied having done so. Yet Mullen, representing "that the [t]rust was already terminated," engaged in negotiations "to sell 300 acres of the Brazoria County [p]roperty."

Mortell brought claims against Scott and Mullen for forgery, fraud, breach of fiduciary duty, money had and received, and constructive trust. She also sought a declaration that the trust had not terminated and asked the trial court to "identify each beneficiary and trustee of the [t]rust[] and describe their rights and duties with regards to the [t]rust, if any." And she requested "that the [trial court] declare that

4

[Mullen] ha[d] no rights, remedies, or individual standing in any proceeding involving the [t]rust."

In his third amended answer and second amended counterclaim, Scott generally denied the allegations in Mortell's petition and requested that the trial court issue certain declarations as to the validity of the trust termination agreement and the distribution of trust assets. Scott also sought attorney's fees pursuant to both Texas Property Code section 114.064[1] and Texas Civil Practices and Remedies Code section 37.009.[2]

Mullen, in her third amended answer and special exceptions to Mortell's petition, generally denied the allegations in Mortell's petition, denied the existence of a fiduciary relationship between her and Mortell, and requested that the trial court "declare that the [trust termination agreement] [wa]s binding on all signatories thereto and was effective on April 5, 2018, the date the last party signed it," or alternatively, that it was "effective on February 12, 2019." Mullen also requested that the trial court award her "reasonable and necessary attorney['s] fees" pursuant

---

[1]     *See* TEX. PROP. CODE ANN. § 114.064 ("Costs").

[2]     *See* TEX. PRAC. & REM. CODE ANN. § 37.009 ("Costs").

5

to Texas Property Code section 114.064 and Texas Civil Practices and Remedies Code section 37.009.[3]

On January 27, 2021, Scott and Mullen filed a joint motion for sanctions, asserting that appellants' position as to whether Moraw, Perry, and Christopher had signed the trust termination agreement and whether their signatures on it were forged "was intentionally fabricated . . . in an attempt to unwind [the trust termination agreement] and return the former trust property to the control of the former trustees and the eventual benefit of Scott's children." According to Scott and Mullen, appellants' scheme was revealed when Christopher "sought to clear his conscience" and "finally admitted that he did in fact execute the [trust] [t]ermination [a]greement." Scott and Mullen asserted that "[d]espite knowing that the [trust] [t]ermination [a]greement had been validly executed" in 2018, Scott's children "concocted a scheme" to challenge its validity more than a year after its execution, after they learned that Scott "had negotiated (and nearly finalized) a lucrative sale of a small portion of the distributed [t]rust property."

Scott and Mullen further asserted that when appellants "discovered that the notary records for the trustees' and Christopher's signatures were either missing or did not reference the [trust] [t]ermination [a]greement," they then "conspired to

---

[3] Moraw and Perry, the former trustees, brought counterclaims against Scott and Mullen for fraud, breach of fiduciary duty, forgery, money had and received, constructive trust, misapplication of fiduciary property, and a declaratory judgment.

manipulate this fact to their benefit and falsely claimed that those signatures and notary acknowledgments were not authentic."

Additionally, appellants falsely claimed that Scott lacked the legal capacity to enter into the trust termination agreement, and they advanced a "conspiracy theory that [Mullen] manufactured a detailed scheme to dissolve the [t]rust." And they "repeatedly committed fraud on [the trial court] by submitting false testimony, falsified pleadings, and evasive and inaccurate discovery responses that [were] premised on lies relating to the [t]ermination [a]greement and its execution."

According to Scott and Mullen, "[t]he lies and deception advanced by Christopher and [appellants] ha[d] wrought devastating harm" on Scott, and appellants "[r]epeatedly harassed" Scott and Mullen. Appellants forced Scott and Mullen "to incur more than $1 million in costs and attorney['s] fees to fend off [appellants'] knowingly frivolous claims" and "deliberately tied up [Scott]'s assets to prevent his use and enjoyment of such assets."

Scott and Mullen explained that the "fraudulent scheme" concocted by appellants "came to light" when Christopher contacted Scott, who referred him to speak to his counsel. Scott's counsel arranged for a January 27, 2021 Zoom[4] meeting with Christopher, which was recorded. Christopher began by stating that he had

---

[4]    Zoom is a videoconferencing platform. *See In re D.L.W.W.*, 617 S.W.3d 64, 71–73 (Tex. App.—Houston [1st Dist.] 2020, no pet.); *see also United States v. Sheppard*,

7

texted [Scott] and said, "you've got people still calling me in regards to the property in Norwood, [Colorado,] taking care of it for the realtor to show, and tax stuff for the cattle." I . . . said, "I can't reach you about these issues on the ranch. How do I do that?" And he said, in a very brief couple sentences, "[Y]ou know, until you do the right thing, and tell the truth, we can't have a relationship and talk. So, you can contact my attorney if you need to get information to me."

Christopher recounted that

this storyline [wa]s convoluted over the past couple years to say the least. But as we all know, it really began with me saying that I didn't sign the [trust] [t]ermination [a]greement. That's not true. I remember signing the [trust] [t]ermination [a]greement. I was clear headed. And after two years—I'm two and a half years—sober, I've been through a gnarly separation and custody battle. And I've lost the most important person, besides my daughter, in my life—is my father, because of my dishonesty and guidance from my sister.

. . . .

[S]o, let's start with me signing the [trust] [t]ermination [a]greement. I went to visit my father . . . in Taos. And he and [Mullen] had presented the [trust] [t]ermination [a]greement to me. All of my sibling[s'] signatures were on there. And I was pretty clear, you know, I'm not going to sign that unless everyone signs it. Well, everyone had signed it, and I was at a place in my life where I was doing well for myself. And I was standing on solid ground. And to me, my father, as I feel now, should do what he wants with his money and his investments. Whether they were in a trust, or not, at a certain point, the trust was liquidated and they had all the signatures. I don't know what happened after that, or it being turned in, but when I went to [the bank notary] with my father, it was the final signature being added to the document.

---

Crim. Action No. 5:17-CR-00026-TBR, 2020 WL 6534326, at *1 (W.D. Ky. Nov. 5, 2020) (mem. op. and order).

8

Scott's counsel asked Christopher why he was recanting his previous sworn statement that he did not sign the trust termination agreement. Christopher explained that after signing the trust termination agreement, he moved to Durango, Colorado. He was "still on good terms" with Scott, but he and Mullen "had begun to have a rocky relationship and it became tumultuous." At that point, he "kind of was on the outs" with Scott. Scott was "disappointed in some decisions" that Christopher had made. So, Christopher "reached out to [Mortell]" because he had no other relatives in Colorado and "[his] daughter ha[d] a lot of cousins" in Telluride, Colorado, where his sister and her children lived. Christopher wanted his daughter "to have [family] in her life." When Christopher "contacted [Mortell], she let [him] know" that she was in a legal dispute with Scott over some condominium properties "in [the] Montrose [area]" of Houston, Texas. Mortell also discussed the interactions that she had with Mullen about signing the trust termination agreement. Mortell told Christopher that "she sent her copy signed, but the notary stamp was smudged," and Mullen had asked her to sign another one. Christopher recounted that when Mortell told him that, "as greedy children do, we decided to make a plan that would place us into a lawsuit against my father's girlfriend" that would "hopefully clear" Mortell of any money that she owed Scott for "some condos that she [had] worked on with [Scott]." According to Christopher, "[t]he frivolous notion that first came up" was based on "bad bookkeeping and probably bad timing," which "kind of shined a light

9

that, oh look, like, we can say we didn't sign it because it [was] not in [the notary's] book." But "[i]t was signed. It just wasn't recorded. And that's what allowed them to have the new attorney say that it was never signed, because there [was] no proof."

As for Christopher, he had told the trial court that he "was notarizing a hunting agreement" because "that's what [his] sister [had] told [him] to say, because [he] had already signed a document with [the same notary] that was a hunting agreement." Christopher remarked that

> this ha[d] kind of been the story of events throughout th[e] case, [wa]s that little tiny things have fallen into place for my sister and what she calls, you know, the family lawsuit, but it's really her and my other siblings. And these little things have kind of fallen into place to build somewhat of a case, but in reality, the case is based off of one lie.
>
> . . . .
>
> And it spiraled far out of control. At th[at] point, I know that my father [wa]s losing a lot of things he's cared about and worked really hard to get to at his age. And, I've had my own trials and tribulations at this point. And some would say they're a lot similar to my father's. And I want to be able to do right by what I've done, and if I can make things better for him, in taking back, you know, I lied. And I lied because I thought I was going to get some money. And I lied because my sister was playing buddy, buddy to me after not having talked to me for five years. And it felt good, but I'm at a point now where I'm on my feet again, and I'm stable, and I'm running my own business—like I mentioned, I'm two and a half years sober. I don't know. I don't want to look back—my dad's 80 years old—I don't want to look back and have been the reason he couldn't enjoy the last years of his life. It's really heavy on my heart. And if I don't get to be a part of his life, I'll understand that. But I don't want to wake up in five years and him be gone, and me have been the reason he couldn't be happy.

Christopher reflected,

[I] don't expect a reconciliation with my dad after this, he's lost a lot of money, and time, and heartache, and probably relationship issues in his home. But I lied for my siblings, and I'm not going to live with that lie the rest of my life. I haven't spoken to anyone about this, about calling you. I haven't even mentioned it to anybody. I don't talk to my siblings because about seven months ago, it turned from being about my dad's care and health, to about the money. And yeah, that was a part of it for me, but I'm the only child that had a relationship with my dad. I'm the only child he raised by himself. And it wasn't just about the money, you know? I had a tumultuous relationship with his girlfriend, and I thought if I somehow played a part in making it bad enough, that she'd be gone, and we'd have our big happy family back. But the issue isn't my dad and [Mullen], or me and [Mullen]. The issue is my siblings, and it always has been.

Christopher concluded,

I love my dad too much to just go on with this lie. I don't care what happens to me, or the [t]rust, or the money. I don't care about any of it, you know. I just want a clear [conscience] about what I put my dad through.

Scott and Mullen, in their motion for sanctions, then turned to Perry, who had initially executed a sworn statement that he did not sign the trust termination agreement and believed that his purported signature on the agreement had been forged. But "less than a month after the lawsuit was filed," Perry's statement "was proven to be false" by the records of the notary who "acknowledged his signature." Perry then recanted his sworn statement and "unequivocally admitted that his signature was authentic and [that] he did, in fact, execute and approve the [t]rust termination agreement."

Scott and Mullen also noted that Moraw, in his original answer, had "characterized [Mortell]'s attempts to invalidate the [trust] [t]ermination [a]greement as not only false but sanctionable," and he criticized Mortell's "lack of due diligence in bringing [her] lawsuit." Yet nine days later, and represented by new counsel, Moraw "withdrew his [o]riginal [a]nswer" and filed a new answer in which he reversed course entirely, challenging the authenticity of his signature on the trust termination agreement, "withdrawing his demand for sanctions against [Mortell]'s frivolous claims and asserting [counter]claims against [Scott and Mullen]."

Scott and Mullen emphasized that the suit against them was "not about an inadvertent misstatement or discovery mistake, but about a mountain of falsified claims, outright lies, perjured testimony, and a total disregard for truth designed to deceive" them and the trial court. They asserted that there was never "a good-faith basis for [appellants] to allege that the [trust termination agreement] was invalid."

Scott and Mullen requested that the trial court "issue terminating sanctions against [appellants] and enter an order striking [appellants'] pleadings and awarding [Scott and Mullen] all attorney['s] fees and costs that they ha[d] incurred in th[e] lawsuit."

After the joint motion for sanctions was filed, Mortell non-suited her claims against Scott and Mullen and the trustees non-suited their counterclaims against Scott and Mullen.

12

In her response to the joint motion for sanctions, Mortell maintained that her "claims hinged upon repeated representations by [Christopher], including at least two instances of sworn testimony before [the trial court], that he did not sign the [trust] [t]ermination [a]greement." Mortell also insisted that she relied in good faith on Christopher's prior sworn statements in bringing her claims against Scott and Mullen. She accused Christopher of "effectively perjur[ing] himself," and she asserted that she should not be punished with sanctions based on Christopher's misconduct.

In response to Scott and Mullen's argument that sanctions were proper against Mortell under Texas Rule of Civil Procedure 13,[5] Mortell noted that she had included several exhibits with her petition, including an affidavit executed by Christopher in which he attested that he did not sign the trust termination agreement. She had believed Christopher and that her claims were meritorious until January 27, 2021, when she learned of Christopher's dishonesty. Further, according to Mortell, Scott and Mullen did not present any evidence that she had "been dishonest or malicious, save for bare conclusory statements from Christopher, who [could not] be believed." Likewise, Mortell asserted that Scott and Mullen presented no evidence affirmatively showing that her attorneys "had actual knowledge throughout the

---

[5]     *See* TEX. R. CIV. P. 13 ("Effect of Signing of Pleadings, Motions and Other Papers; Sanctions").

13

course of [the] lawsuit that Christopher was lying in his [a]ffidavit" or that Mortell and Christopher had "conspired together."

In their response to the joint motion for sanctions, Moraw and Perry asserted that they brought their counterclaims against Scott and Mullen in good faith reliance on Christopher's sworn statements that he did not sign the trust termination agreement. On October 7, 2021, Moraw and Perry also filed a supplemental response to the joint motion for sanctions. They noted that Christopher failed to respond within thirty days to the request for admissions that they had served on him September 3, 2021, in which they asked Christopher to admit that his statement in the Zoom meeting recording that he signed the trust termination agreement was false, and they asserted that such deemed admission bolstered the validity of his prior sworn testimony that he did not sign the trust termination agreement.

On February 22, 2021, Scott and Mullen filed a motion for entry of a declaratory judgment, seeking a declaratory judgment in favor of Scott and Mullen that the trust did terminate and was no longer in existence and that the trust termination agreement was valid and enforceable. On March 12, 2021, the trial court granted the request for a declaratory judgment, declaring that the trust termination agreement was valid and enforceable and was binding on all signatories thereto; the trust was terminated and was no longer in existence; and Scott was the owner of the property formerly held in the trust.

At the evidentiary hearing on Scott and Mullen's joint sanctions motion, Scott testified he was eighty-one years old and considered himself a "self-made man in th[e] area of property development." He bought the Brazoria County property because of its "investment potential" and created the trust as "the best way" to hold property based on his knowledge "of tax situations." Scott had Moraw named as the original trustee because Moraw was a longtime friend, and Scott expected that Moraw would allow him to retain control over and make decisions about the trust property. About twenty years after creating the trust, Scott decided to have Perry appointed as co-trustee because Scott and Moraw were getting older, and like Moraw, Perry would "do what [Scott] asked him to do."

Several years later, Mullen brought to Scott's attention a change in the tax treatment of inheritances. Scott learned that the trust was no longer necessary to maximize the financial benefit to his heirs. After getting a legal opinion to make sure there would not be any tax consequences, Scott decided to terminate the trust.

In March 2018, Scott sent a letter to his children about his decision to terminate the trust along with a copy of the trust termination agreement. The letter was "absolutely [his] thoughts and [in his] handwriting." One reason for terminating the trust was his difficulty in getting Moraw and Perry to respond to time-sensitive requests during his negotiations to sell a portion of the trust property. With the

copies of the trust termination agreement sent to Moraw and Perry, Scott sent stamped return envelopes in an effort to "make it as easy as possible on [them]."

Scott was confident that Christopher signed the trust termination agreement because he did so when he was visiting Scott and Mullen. He told Christopher that it was "a perfect time to get [his] . . . signature" on the trust termination agreement, and they drove to the bank, where Scott knew one of the notaries by name. They sat down with the notary, and with Scott and the notary watching, Christopher signed the trust termination agreement.

"[E]verything was done" as to finalizing the trust termination agreement before summer 2018. By the time that Mortell's suit was filed in April 2019, "no one had said a thing" to him about the trust termination agreement for eleven months. He saw all the allegations made in the suit, and they were "[a]ll untruths." He saw the claims that he was incompetent and lacked mental capacity. He "couldn't believe it," and no doctor had ever concluded that.

In October 2019, Scott went to a "respected neurologist" to evaluate his mental capacity. In his report, the neurologist concluded that Scott was "perfectly competent to handle his own affairs" and there was "no evidence of cognitive decline." Scott also noted that he was still negotiating sophisticated land transactions at the time.

Perry testified that Scott, who was his cousin, asked him to serve as co-trustee of the trust in about 2011. At some point, Perry heard "that they wanted to do away with the trust." Mullen told him that "all of the children had agreed" to terminate the trust.

Cameron McCulloch, an estates attorney who had previously represented Perry in connection with another matter, sent him a proposed affidavit, which stated: "I did not sign the [trust termination agreement], nor did I have any signature on the [trust termination agreement] notarized." Perry took the affidavit to a bank and signed it. Perry conceded that the statement in the affidavit was not true, but he did not remember reading the affidavit before signing it. And he did not know that if he signed an untruthful statement under oath that it would constitute perjury. After a while, Perry "started to worry" about having signed the affidavit. He was concerned about whether he "was getting the right things out there." He went back to the notary to see if he was wrong. When faced with evidence that he actually had signed the trust termination agreement, Perry recanted his affidavit statements and admitted that he had signed the trust termination agreement.

Perry further testified that he hired Darlene Smith and Jocelyn Slater of Crain, Caton, & James to represent him "because there were questions about the trust." Perry did not remember receiving the petition naming him, in his capacity as co-trustee, as a party in Mortell's suit.

17

Perry also testified that he served as co-trustee of the trust with Moraw for about seven years. Each co-trustee under the trust was an independent trustee and could act on their own, so he never had to interact with Moraw. If they did interact during the time they were co-trustees, "it had nothing to do with the [t]rust."

Perry noted that he was legally blind and had other health conditions and "some memory issues." It was difficult for him to read lengthy documents. Usually he just tried to "get the gist" of what he was reading.

As to Christopher, Perry explained that Christopher spoke to him over the telephone about whether he signed the trust termination agreement. Christopher told Perry that he had not signed the document, and Perry believed him.

Lawrence Packard, an attorney, testified that he had known Moraw for "at least [thirty] years." During that time, he had represented Moraw in about ten to fifteen different matters. Moraw retained Packard in 2019 to represent him in connection with Mortell's suit. Packard filed an answer for Moraw and then resigned from representing Moraw. Moraw's affidavit denying that he had signed the trust termination agreement was dated after Packard had resigned. Packard did not know whether Moraw reviewed the answer that Packard had filed on Moraw's behalf before Packard filed it, but he knew that Moraw "got a copy at some point in time, maybe before, maybe after."

Moraw testified that he was the original trustee for the trust and remained a trustee until the trust was terminated in 2018. Moraw initially denied having signed the trust termination agreement, but ultimately acknowledged that his signature did appear on the agreement, although he could not explain how it got there.

After the hearing, the trial court sent a letter to the parties notifying them of its intent to grant Scott and Mullen's joint sanctions motion. After nearly a year after the trial court had granted Scott and Mullen's unopposed request for a declaratory judgment, declaring that the trust had terminated and that Scott was the "sole and exclusive owner" of the property formerly held by the trust, appellants filed a motion for reconsideration of the declaratory judgment. The trial court denied that motion.

On February 22, 2022, the trial court signed an order granting the Scott and Mullen's joint motion for sanctions and awarding sanctions to Scott and Mullen for the sanctioned parties' violations of Texas Rule of Civil Procedure 13 and Texas Civil Practice and Remedies Code chapter 10. In its findings of fact and conclusions of law in support of its order granting the joint motion for sanctions, the trial court found:

- In 2018, [Scott] requested that the [t]rust be terminated and the [t]rust's assets be distributed to him due to the changing business climate.

- Accordingly, [Scott], together with his wife, [Mullen], prepared [the trust termination agreement].

- At various times in March and April of 2018, the [t]rustees, [Scott], and each of the four children signed the [t]ermination [a]greement . . . .

- Each signatory to the [t]ermination [a]greement had his or her signature acknowledged before a notary public.

- The [t]ermination [a]greement was effective on April 5, 2018.

- The allegation that [Mullen] forged the signatures on the [trust termination agreement] was included in each of the [s]anctioned [p]arties' affirmative pleadings in th[e] lawsuit and was continued in each [a]mended [p]etition thereafter.

- The [s]anctioned [p]arties all failed to reasonably investigate the allegation of forgery.

- [Mortell] testified that she was not aware of: (i) any witness that saw [Mullen] forging a signature to the [trust termination agreement]; (ii) any photo, video, affidavit, or other document suggesting that [Mullen] forged a signature to the [trust termination agreement]; or (iii) any evidence whatsoever that she was aware of to suggest that [Mullen] forged any signatures to the [trust termination agreement].

- [Mullen] testified that [Christopher] did not verify his signature with the notary [who] attested to it before filing suit.

- [Mortell] testified that she ha[d] never been aware of any evidence of any kind that [Mullen] forged any signature to the [trust termination agreement], specifically including the signatures of [Christopher], [Perry], or [Moraw].

- [Mortell] testified that despite the fact that she was never aware of any evidence to support those allegations, she didn't withdraw the claims because she followed what her attorneys told her to do.

- [Perry] testified that he was not aware of any evidence to suggest that [Mullen] ever forged any signature to the [trust termination agreement], including his own.

- [Mortell] also confirmed at the [s]anctions [h]earing that despite retaining a handwriting expert in th[e] matter, there was never any handwriting expert that was willing to testify that [Mullen] had forged or wrongfully signed any of the signatures on the [trust termination agreement].

- [Moraw] testified that the signature on the [trust termination agreement] looked like his but he had no explanation for how his signature got onto the agreement.

- [Perry] testified that he was not aware of any evidence to support the forgery claims or allegations asserted on his behalf and ha[d] never been aware of anything that would support that claim.

Further, the trial court concluded that:

- Neither the [sanctioned] parties nor the attorneys made reasonable inquiries about [Perry's], [Moraw's], or [Christopher's] signatures to the trust termination agreement prior to filing the pleadings alleging forgery.

- The length of time the allegations were maintained without reasonable investigation made [Scott and Mullen] incur excessive amounts of attorney's fees and costs.

- Good cause exist[ed] to impose sanctions because the failure to investigate the claims of misconduct involving the integrity of another resulted in pleadings that were filed in bad faith and under the facts of this case, for purposes of harassment.

- The[] sanctions [we]re just, appropriate, necessary and limited to an amount to deter similar misconduct by the [s]anctioned [p]arties and others who learn of the issued sanctions.

21

The trial court also considered Scott's request for $657,307.64 in attorney's fees and expenses as well as Mullen's request for $1,919,522.62 in attorney's fees and expenses as sanctions. The trial court found that "[t]he fees charged by [Mullen's attorneys] [we]re not reasonable rates for Brazoria County" and that "[t]he affidavits of [Scott's attorneys] correctly reflect[ed] a reasonable rate in Brazoria County . . . of $475 an hour based on their experience."

Based on its findings of fact and conclusions of law, the trial court found that Scott was entitled to recover $38,997.50 in sanctions and $54,755.00 in sanctions as partial payment of his attorney's fees. As to Mullen, the trial court found that she was entitled to recover $160,977.00 in attorney's fees as sanctions "as partial payment of her attorney's fees." The trial court also awarded Scott and Mullen conditional appellate attorney's fees.

In its final judgment, the trial court ordered that Scott recover reasonable and necessary attorney's fees in the amount of $40,000.00 against Mortell and reasonable and necessary attorney's fees and expenses in the amount of $5,000.00 against both Moraw and Perry for defending against the declaratory judgment claims in the suit asserted by Mortell, and "under the discretionary provisions of [Texas Property Code section 114.064] and [Texas Civil Practices and Remedies Code section 37.009]." As to Mullen, the trial court likewise ordered that she recover attorney's fees of $40,000.00 against Mortell and reasonable and necessary

attorney's fees and expenses in the amount of $5,000.00 against both Moraw and Perry for defending against the declaratory judgment claims in the suit asserted by Mortell, and "under the discretionary provisions of [Texas Property Code section 114.064] and [Texas Civil Practices and Remedies Code section 37.009]." And the trial court awarded both Scott and Mullen conditional appellate attorney's fees. Finally, the trial court ordered that appellants take nothing on their claims and counterclaims against Scott and Mullen.

## Sanctions

In their first and third issues, appellants argue that the trial court erred in granting the joint sanctions motion filed by Scott and Mullen and in failing to grant appellants' request for jury trial because appellants' pleadings were brought in good faith, Christopher was the one who engaged in misconduct, and a jury should have decided whether Christopher signed the trust termination agreement.

A trial court may be authorized to impose sanctions against a party or a party's attorney by rule, statute, or its inherent authority. *See, e.g.*, TEX. R. CIV. P. 13; TEX. CIV. PRAC. & REM. CODE ANN. §§ 10.001–.006; *Phillips v. Am. Bankers Ins. Co. of Fla.*, No. 01-18-00375-CV, 2019 WL 3121856, at *7 (Tex. App.—Houston [1st Dist.] July 16, 2019, pet. denied) (mem. op.) ("A trial court possesses the inherent authority to impose sanctions for a bad faith abuse of the judicial process even when the specific conduct is not covered by a rule or statute."). We review a trial court's

23

order denying sanctions for an abuse of discretion. *See Am. Flood Research, Inc. v. Jones*, 192 S.W.3d 581, 583 (Tex. 2006); *Am. Fisheries, Inc. v. Nat'l Honey, Inc.*, 585 S.W.3d 491, 506 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). We may reverse the trial court's ruling on a motion for sanctions only if the trial court acted without reference to any guiding rules and principles, such that its ruling was arbitrary or unreasonable. *See Am. Flood Research*, 192 S.W.3d at 583; *Am. Fisheries*, 585 S.W.3d at 506. The trial court does not abuse its discretion if it bases its decision on conflicting evidence and some evidence supports its decision. *Unifund CCR Partners v. Villa*, 299 S.W.3d 92, 97 (Tex. 2009); *Am. Fisheries*, 585 S.W.3d at 506.

A trial court may impose sanctions under Texas Rule of Civil Procedure 13 if a party or a party's attorney files a pleading that is groundless and that is brought in bad faith or for the purpose of harassment. *See* TEX. R. CIV. P. 13; *Am. Fisheries*, 585 S.W.3d at 506. "Groundless" means "no basis in law or fact and not warranted by good faith argument for the extension, modification, or reversal of existing law." TEX. R. CIV. P. 13 (internal quotations omitted). "To determine if a claim is groundless, the trial court must objectively ask whether the party and [its] counsel made a reasonable inquiry into the legal and factual basis of the claim at the time the [pleading] in question was filed." *WWW.URBAN.INC. v. Drummond*, 508 S.W.3d 657, 676 (Tex. App.—Houston [1st Dist.] 2016, no pet.). The court determines

24

whether the party and its counsel made a reasonable inquiry into the legal and factual basis of the claim by considering the circumstances that existed when the pleading was filed. *Id.* "Bad faith" means "the conscious doing of a wrong for dishonest, discriminatory, or malicious purposes." *Thielemann v. Kethan*, 371 S.W.3d 286, 294 (Tex. App.—Houston [1st Dist.] 2012, pet. denied). "Improper motive is an essential element of bad faith." *Gomer v. Davis*, 419 S.W.3d 470, 478 (Tex. App.—Houston [1st Dist.] 2013, no pet.). "Bad faith does not exist when a party merely exercises bad judgment or is negligent." *Thielemann*, 371 S.W.3d at 294. "To 'harass' means to annoy, alarm, and verbally abuse another person." *Id.* Whether a party or its counsel acted in bad faith or for the purpose of harassment is also determined in reference to the circumstances that existed when the pleading was filed. *Drummond*, 508 S.W.3d at 676.

Notably, a court is to presume that "pleadings, motions and other papers are filed in good faith." TEX. R. CIV. P. 13. And the party moving for sanctions bears the burden of overcoming that presumption. *Am. Fisheries*, 585 S.W.3d at 506. The trial court's decision to impose sanctions under Texas Rule of Civil Procedure 13 is discretionary. *Manning v. Enbridge Pipelines (E. Tex.) L.P.*, 345 S.W.3d 718, 728–29 (Tex. App.—Beaumont 2011, pet. denied).

Like Texas Rule of Civil Procedure 13, Texas Civil Practice and Remedies Code chapter 10 allows the trial court to sanction a party or a party's attorney for

25

filing a motion or pleading with an improper purpose or that lacks legal or factual

support. *Nath v. Tex. Children's Hosp.*, 446 S.W.3d 355, 362 (Tex. 2014);

*Beddingfield v. Beddingfield*, No. 10-15-00344-CV, 2018 WL 6378553, at *15 (Tex.

App.—Waco Dec. 5, 2018, pet. denied) (mem. op.). Specifically, Texas Civil

Practice and Remedies Code section 10.001 provides, in pertinent part:

> The signing of a pleading or motion as required by the Texas Rules of
> Civil Procedure constitutes a certificate by the signatory that to the
> signatory's best knowledge, information, and belief, formed after
> reasonable inquiry:
>
> (1) the pleading or motion is not being presented for any improper
> purpose, including to harass or to cause unnecessary delay or needless
> increase in the cost of litigation;
>
> (2) each claim, defense, or other legal contention in the pleading or
> motion is warranted by existing law or by a nonfrivolous argument for
> the extension, modification, or reversal of existing law or the
> establishment of new law;
>
> (3) each allegation or other factual contention in the pleading or motion
> has evidentiary support, or for a specifically identified allegation or
> factual contention, is likely to have evidentiary support after a
> reasonable opportunity for further investigation or discovery; and
>
> (4) each denial in the pleading or motion of a factual contention is
> warranted on the evidence or, for a specifically identified denial, is
> reasonably based on a lack of information or belief.

TEX. CIV. PRAC. & REM. CODE ANN. § 10.001. Thus, a trial court may impose

sanctions on a party or the party's signatory for a violation of one of the statutory

provisions in section 10.001.[6]  *See id.* § 10.004 ("A court that determines that a person has signed a pleading or motion in violation of [s]ection 10.001 may impose a sanction on the person, a party represented by the person, or both."); *see also id.* § 10.002 ("A party may make a motion for sanctions, describing the specific conduct violating [s]ection 10.001.").  The party moving for sanctions under Texas Civil Practice and Remedies Code chapter 10 has the burden to prove the pleading party's subjective state of mind, and the same presumption that "pleadings, motions and other papers are filed in good faith" applies.  *See Drummond*, 508 S.W.3d at 675; *see also GTE Commc'ns Sys. Corp. v. Tanner*, 856 S.W.2d 725, 731 (Tex. 1993) (trial court presumes parties and their counsel file all papers in good faith, and party seeking sanctions must overcome that presumption).  The trial court's decision to impose sanctions under chapter 10 is entirely discretionary.  *Manning*, 345 S.W.3d at 728.

Appellants assert that the evidence showed that they believed Christopher's repeated statements that he did not sign the trust termination agreement and that Scott and Mullen presented no evidence that Mortell or Moraw and Perry were

---

[6]     The trial court "may not award monetary sanctions against a represented party" for making an unwarranted or frivolous legal contention in contravention of Texas Civil Practice and Remedies Code section 10.001(2).  *See* TEX. CIV. PRAC. & REM. CODE ANN. § 10.004(d).

27

motivated by dishonest, discriminatory, or malicious purposes. We disagree. At best, the evidence raises a genuine dispute about the motives of appellants.

Mortell stated that she believed Christopher was untrustworthy and knew him to be untruthful, yet she admitted that she took no steps before filing suit to investigate whether Christopher had signed the trust termination agreement. Moraw denied having signed the trust termination agreement, but he had no explanation for how his signature came to appear on the agreement, and he admitted that the signature on the trust termination agreement looked like his signature. And Perry, who had initially denied having signed the trust termination agreement, came to admit after looking into the notary records that he actually did sign it. Further, Mortell, Moraw, and Perry had no facts to support their allegations of misconduct against Mullen. The evidence thus supports the trial court's finding that "that neither the [sanctioned] parties nor the attorneys made reasonable inquiries about" the signatures to the trust termination agreement before they filed pleadings alleging that Mullen had committed forgery.

Appellants also assert that Christopher's statements recorded during the Zoom meeting, which were "the sole basis for awarding sanctions," were inadmissible hearsay and thus could not support sanctions against them.

The Texas Rules of Evidence generally define "[h]earsay" as a statement that "the declarant does not make while testifying at the current trial or hearing" that "a

28

party offers in evidence to prove the truth of the matter asserted in the statement." TEX. R. EVID. 801(d) (internal quotations omitted). Whether hearsay is inadmissible depends on numerous factors, and many exceptions allow its admission at trial. *See id.* 803, 804. Pertinent here, the statement against interest exception to the hearsay rule provides that a statement is not excluded by the rule against hearsay if it is a statement that "a reasonable person in the declarant's position would have made only if the person believed it to be true because, when made, it was so contrary to the declarant's proprietary or pecuniary interest or had so great a tendency to invalidate the declarant's claim against someone else or to expose the declarant to civil or criminal liability or to make the declarant an object of hatred, ridicule, or disgrace." *Id.* 803(24)(A).

Here, Christopher's statement was against his pecuniary interest because it extinguished any possibility of his recovery in the lawsuit as a contingent beneficiary of the trust. *See Keeney v. Williams*, No. 07-19-00374-CV, 2020 WL 5267568, at *4 (Tex. App.—Amarillo Sept. 3, 2020, no pet.) (mem. op.) (statement forgoing property interest was against pecuniary interest); *Leigh v. Weiner*, 679 S.W.2d 46, 49 (Tex. App.—Houston [14th Dist.] 1984, no pet.) (same). And Christopher's recantation of his prior sworn statements in which he had denied having signed the trust termination agreement also exposed him to charges of perjury. *See Robinson v. Harkins & Co.*, 711 S.W.2d 619, 621 (Tex. 1986). Thus, Christopher's statement

29

during the Zoom meeting falls within the exception to the hearsay rule set forth in Texas Rule of Evidence 803(24)(A).

Appellants also rely on the argument they made in their supplemental response to Scott and Mullen's joint sanctions motion that Christopher's failure to respond to their request for admissions, including a request that he admit that his Zoom statement that he did sign the trust termination agreement was false and his prior sworn statements that he did not sign the trust termination agreement was true, meant that the trial court was required to consider them as having conclusively established those deemed admissions as facts. But deemed admissions apply only against the party making the admission; they are not admissible against third parties, like Scott and Mullen. *See Cartwright v. MBank Corpus Christi, N.A.*, 865 S.W.2d 546, 550 (Tex. App.—Corpus Christi-Edinburg 1993, no writ); *see also* TEX. R. CIV. P. 169(2); *USX Corp. v. Salinas*, 818 S.W.2d 473, 479 (Tex. App.—San Antonio 1991, writ denied) ("[I]t is well settled that deemed admissions resulting from one defendant's failure to respond to the requests may not be imputed to a co-defendant nor are they binding upon the latter due to their hearsay nature."). Because the deemed admissions did not apply to Scott and Mullen, the trial court did not err in declining to consider them as a basis for denying the joint sanctions motion.

Further, appellants assert that Christopher's statement during the Zoom meeting, which contradicted his prior sworn statements about whether he signed the

30

trust termination agreement, created a fact issue a that should have been resolved in a jury trial. We note that appellants did not file their request for a jury trial and motion for reconsideration until long after the trial court had granted Scott and Mullen's unopposed request for declaratory judgment and after the trial court had sent the parties a letter informing them of its intent to grant the joint sanctions motion. Under these circumstances, the trial court had the discretion to deny the request for jury trial and motion for reconsideration solely for the purpose of managing its docket. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 240 (Tex. 2001) (trial courts have "inherent power to control the disposition of cases with economy of time and effort for itself, for counsel, and for litigants." (internal quotations omitted)); *see also* TEX. R. CIV. P. 216 (civil litigant entitled to jury trial only if "a written request for a jury trial is filed with the clerk of the court a reasonable time before the date set for trial").

Appellants also complain about the trial court's denial of their belated request for a jury trial on the issue of attorney's fees based on the trial court's finding that the parties had agreed to try attorney's fees by affidavit.[7] The trial court's finding is grounded in a discussion held in open court on October 8, 2021, in which Mullen's attorney noted that Mullen had a pending motion for attorney's fees "under the

---

[7] To the extent appellants raise this as a separate issue, we consider and dispose of it as part of their third issue, which also complains about the trial court's refusal to grant their request for a jury trial.

31

[Texas] Declaratory Judgment Act and some other provisions." The trial court then asked whether the parties could "do [their] attorney['s] fees by affidavit." Mullen's attorney and Scott's attorney both responded that they agreed to present the attorney's fees by affidavit. Moraw and Perry's attorney was present at the hearing but did not respond. The trial court asked if there were "any objections" to presenting attorney's fees by affidavit, and Mortell's attorney responded that Mortell was "going to have objections to the fees, the amounts, the reasonableness, all that," but could "do it by affidavit if [the trial court] want[ed] [them] to." After Scott and Mullen filed their fee requests, accompanied by the attorney's fee affidavits, appellants filed various objections in response, but they did not object to the submission of the affidavits or request a jury trial on attorney's fees at that time. Again, appellants did not file a request for jury trial until after the trial court sent the parties a letter indicating its intent to grant the motion for sanctions and the amount of attorney's fees that it intended to award Scott and Mullen. The same docket management rationale that applied to the rest of the proceeding makes this issue unavailing. *See Dow Chem. Co.*, 46 S.W.3d at 240. Further, because appellants did not timely object to the trial court's proposal that the attorney's fees be tried by affidavit and acquiesced to the mode of presentation by responding to the fee requests without opposing such proposal, they waived any complaint about the trial court's finding that they agreed to try the issue of attorney's fees by affidavit. *See*

32

*Aguiar v. Segal*, 167 S.W.3d 443, 451 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) (waiver can be established by a party's express renunciation of a known right or by "silence or inaction for so long a period as to show an intention to yield the known right."); *see also* TEX. R. CIV. P. 216 (civil litigant entitled to jury trial only if "a written request for a jury trial is filed with the clerk of the court a reasonable time before the date set for trial"); TEX. R. APP. P. 33.1 (preservation of error for appellate review requires appellant to make timely request or objection in trial court).

Based on the foregoing, we hold that trial court did not err in granting the joint sanctions motion filed by Scott and Mullen and in failing to grant appellants' request for a jury trial.

We overrule appellants' first and third issues.

### Attorney's Fees

In their second and fourth issues, appellants assert that the trial court erred in awarding Scott and Mullen attorney's fees. In their sole issue on cross-appeal, Scott and Mullen assert that the trial court erred in not awarding "the full amount" of attorney's fees.

We review a trial court's award of attorney's fees for an abuse of discretion. *See Fort Worth Transp. Auth. v. Rodriguez*, 547 S.W.3d 830, 850 (Tex. 2018). A trial court abuses its discretion when it acts in an arbitrary or unreasonable manner

without reference to guiding rules or principles. *See Hill v. Shamoun & Norman, LLP*, 544 S.W.3d 724, 742 (Tex. 2018); *Samlowski v. Wooten*, 332 S.W.3d 404, 410 (Tex. 2011). Under this standard, we cannot reverse the trial court's award merely because we would have awarded a different amount of fees. *See Samlowski*, 332 S.W.3d at 410 (noting abuse of discretion standard of review insulates trial court's reasonable decisions from appellate second-guessing). "Further, courts are free to look at the entire record, the evidence presented on reasonableness, the amount in controversy, the common knowledge of the participants as lawyers and judges, and the relative success of the parties to determine a reasonable fee." *McMahon v. Zimmerman*, 433 S.W.3d 680, 693 (Tex. App.—Houston [1st Dist.] 2014, no pet.); *see also Santos v. Tex. Enters., Inc.*, No. 03-09-00579-CV, 2010 WL 4054479, at *2 (Tex. App.—Austin Oct. 15, 2010, no pet.) (mem. op.).

Texas follows the lodestar method to determine the amount of an award of attorney's fees.[8] *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d

---

[8] The lodestar method is a shorthand version of the *Arthur Andersen* factors that a fact finder should consider when determining the reasonableness of a fee. *See Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 496 (Tex. 2019) (citing *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818 (Tex. 1997) (listing factors as (1) time and labor required, novelty and difficulty of questions involved, and skill required to perform legal service properly; (2) likelihood that acceptance of particular employment will preclude other employment by lawyer; (3) fee customarily charged in locality for similar legal services; (4) amount involved and results obtained; (5) time limitations imposed by client or by circumstances; (6) nature and length of professional relationship with client; (7) experience, reputation, and ability of lawyer or lawyers performing

34

469, 496 (Tex. 2019). The lodestar method requires the fact finder to determine reasonable attorney's fees by first determining the reasonable hours spent by counsel in the case and the reasonable hourly rate for counsel's work. *See El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 760 (Tex. 2012). The fee claimant must provide sufficient evidence of both the reasonable hours worked and the reasonable hourly rate. *Rohrmoos*, 578 S.W.3d at 498. Sufficient evidence includes, at a minimum, evidence of (1) the nature of the work performed, (2) who performed those services, (3) approximately when the services were performed, (4) the reasonable amount of time required to perform the services, and (5) the reasonable hourly rate for each person performing such services. *See id.*; *see also City of Laredo v. Montano*, 414 S.W.3d 731, 736 (Tex. 2013) ("In *El Apple*, we said that a lodestar calculation requires certain basic proof, including itemizing specific tasks, the time required for those tasks, and the rate charged by the person performing the work."). The fee claimant must establish the reasonableness and necessity of its requested fees. *Rohrmoos*, 578 S.W.3d at 488.

## A.     Amount of Attorney's Fees Awarded as Sanctions

In their second issue, appellants argue that the trial court erred in awarding Scott and Mullen a portion of their attorney's fees as sanctions because Scott and

---

services; and (8) whether fee is fixed or contingent on results obtained or uncertainty of collection before legal services have been rendered)).

Mullen did not prove that the requested fees were reasonable and necessary. In their sole issue on cross-appeal, Scott and Mullen argue that the trial court erred in awarding them attorney's fees because it only awarded them a small portion of the attorney's fees they incurred. We consider these issues in turn.

Appellants specifically assert that Scott and Mullen did not properly segregate their fees related to their joint sanctions motion and the declaratory-judgment claim from other work in the case, and they accuse Scott and Mullen's attorney's-fee evidence of failing to segregate work in connection with defending against Moraw and Perry's counterclaims or sanctionable conduct from work defending against Mortell's claims or addressing her sanctionable conduct and of "block billing."[9] Appellants, though, provide no record citations or analysis of pertinent authority to support their arguments. To assert an issue on appeal, an appellant's brief "must contain a clear and concise argument for the contentions made, with appropriate citations to authorities." TEX. R. APP. P. 38.1(i). An appellant waives an issue on appeal if he does not adequately brief that issue by providing supporting arguments, substantive analysis, and appropriate citations to authorities and the record. *See id.*; *Marin Real Estate Partners, L.P. v. Vogt*, 373 S.W.3d 57, 75 (Tex. App.—San

---

[9] "Block billing" refers to a practice of including multiple tasks in a single billing time entry. *Lederer v. Lederer*, No. 14-21-00012-CV, 2022 WL 11551156, at *7 (Tex. App.—Houston [14th Dist.] Oct. 20, 2022, no pet.) (mem. op.). It "is generally disfavored, particularly in federal court, because it can make meaningful review of attorney's fees difficult." *Id.*

Antonio 2011, no pet.); *Huey v. Huey*, 200 S.W.3d 851, 854 (Tex. App.—Dallas 2006, no pet.); *Cervantes-Peterson v. Tex. Dep't of Fam. & Protective Servs.*, 221 S.W.3d 244, 255 (Tex. App.—Houston [1st Dist.] 2006, no pet.); *see also Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284–85 (Tex. 1994). "Only when [the Court is] provided with proper briefing may [it] discharge [its] responsibility to review the appeal and make a decision that disposes of the appeal one way or the other." *Bolling v. Farmers Branch Indep. Sch. Dist.*, 315 S.W.3d 893, 895 (Tex. App.—Dallas 2010, no pet.). Accordingly, we hold that appellants waived their second issue due to inadequate briefing.

In considering Scott and Mullen's sole issue on cross-appeal, we note that "[w]hen a party seeks attorney's fees as sanctions, the burden is on that party to put forth some affirmative evidence of attorney's fees incurred and how those fees resulted from the sanctionable conduct." *CHRISTUS Health Gulf Coast v. Carswell*, 505 S.W.3d 528, 540 (Tex. 2016). As to determining what Scott and Mullen were entitled to recover, Scott and Mullen assert that the attorney's-fee evidence that they provided to the trial court satisfied the "strong presumption" that the full amount of the requested fees under the base lodestar calculation was reasonable. In determining the appropriate fee award as sanctions, though, the trial court was also tasked with determining the extent to which the sanctioned parties acted in bad faith. The trial court explicitly recognized that "[o]bviously not all the attorneys' time was

spent on the cause of action found to be filed in bad faith" and reduced "the total fees awarded . . . accordingly." It also limited the sanctions it imposed to an amount necessary "to deter similar misconduct by the [s]anctioned [p]arties and others who learn of the issued sanctions."

We cannot say that the trial court erred in determining that only a portion of the attorney's fees requested by Scott and Mullen was appropriate to sanction the misconduct that it found appellants had committed. *See Thielemann*, 371 S.W.3d at 294 (bad faith does not exist when party merely exercises bad judgment or is negligent). Thus, we hold that the trial court did not err in determining the amount of attorney's fees awarded to Scott and Mullen as sanctions.

We overrule Scott and Mullen's sole issue on cross-appeal.

## B. Attorney's Fees under the Texas Declaratory Judgment Act and Texas Theft Act

In their fourth issue, appellants argue that the trial court erred in awarding Mullen her attorney's fees for her claims under the Texas Declaratory Judgment Act and the Texas Trust Act because the trial court also found that Mullen lacked statutory standing to pursue those claims.

Mullen's standing, though, is not a criterion that the trial court was required to consider in determining whether she was entitled to recover her attorney's fees under the Texas Declaratory Judgment Act. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 37.009 ("In any proceeding under this chapter, the court may award costs and

reasonable and necessary attorney's fees as are equitable and just."); *see also* TEX. PROP. CODE ANN. § 114.064(a) ("In any proceeding under this code the court may make such award of costs and reasonable and necessary attorney's fees as may seem equitable and just."). Appellants do not identify any authority to support their assertion, and Texas courts, including our own, have allowed for recovery under comparable circumstances. *See, e.g.*, *Feldman v. KPMG LLP*, 438 S.W.3d 678, 685–86 (Tex. App.—Houston [1st Dist.] 2014, no pet.) ("[W]e conclude that the trial court had the power to award attorney's fees [to defendants] under [Texas Civil Practice and Remedies Code] [s]ection 37.009 even though it had dismissed [plaintiff's] claim for declaratory relief for lack of jurisdiction.").

Whether Mullen had statutory standing thus does not affect her entitlement to attorney's fees under the Texas Declaratory Judgment Act or the Texas Trust Act. Thus, we hold that the trial court did not err in awarding Mullen her fees under those statutes.

We overrule appellants' fourth issue.

## Conclusion

We affirm the judgment of the trial court.

Julie Countiss
Justice

Panel consists of Chief Justice Adams and Justices Hightower and Countiss.